88 So.2d 508 (1956)
ALL FLORIDA SURETY COMPANY, A FLORIDA CORPORATION, APPELLANT,
v.
RALPH H. COKER, D/B/A COKER PLUMBING, APPELLEE.
ALL FLORIDA SURETY COMPANY, A FLORIDA CORPORATION, APPELLANT,
v.
OLIN P. WRIGHT, APPELLEE.
Supreme Court of Florida, En Banc.
June 20, 1956.
Rehearing Denied July 17, 1956.
*509 Henry L. Balaban and Thomas A. Horkan, Jr., Miami, for appellant.
Ruff & Ready, Miami, for Ralph H. Coker and Turner & Hodson, Homestead, for Olin P. Wright, appellees.
ANDERSON, Associate Justice.
H.O. Barber was awarded a contract by the Orange State Oil Company for the construction of a filling station at Islamorado, Florida. He sublet the plumbing work to Ralph H. Coker and the electrical work to Olin P. Wright. He applied to All Florida Surety Company for a performance bond to insure the fulfillment of the contract. His application was rejected because of his unstable financial condition. The agent of the surety company suggested that he secure others to become co-indemnitors upon his application for the bond. Barber said that his subcontractors would be agreeable to assuming that obligation. The agent, after learning the names of the subcontractors, looked them up in Dun & Bradstreet and informed Barber that they were "bondable." He thereupon prepared application for bonds for Coker and Wright and indemnity agreements for them to sign, marked the places for their signatures with a red pencil and gave them to Barber with directions to get the signatures of Coker and Wright to the papers prepared by him and get financial statements from both.
Barber took the papers prepared by the agent of the surety company to Coker and Wright and procured their signatures upon the application for bonds and the indemnity agreements. He also got financial statements from them. These he delivered to the surety company who thereupon signed the performance bond on behalf of the surety company. The agent of the surety company had no dealings with Coker or Wright other than as above set forth.
Barber defaulted on his contract. The surety company completed it at a cost of approximately $6,000. It then called on Coker and Wright for reimbursement under their indemnity agreement. They refused and it brought suit.
Coker and Wright thereupon brought these identical suits in equity for a rescission of the indemnity agreements upon the ground that they had been falsely represented to them by Barber, as agent of the surety company, and that they had neglected to read them when presented for their signature. The special master found that "* * * Barber falsely represented to Coker and Wright that the instruments he was requesting them to sign were those required in order that they, as sub-contractors, could be bonded" and they "relied on Barber's representations as to the nature of the instruments, and that they signed without reading" them and "that there was such a confidential relationship existing between Barber and Coker and Wright * * * it is doubtful if they would have *510 understood them [the documents] on account of their lack of experience and education * * *" (Emphasis added.)
The Chancellor sustained the master's recommendation that the documents be rescinded and that the surety company's counterclaim for their enforcement be dismissed as to Coker and Wright.
The surety company appealed.
The decree must be reversed. There is no evidence that Barber, assuming that he did the things with which he is charged, was acting for the surety company. Coker and Wright both knew what his status in the transaction was and what his relationship to them was. They knew that he was not the agent of the surety company. As above pointed out, the agent or the surety company never had any contacts with Coker and Wright. There is a total absence of proof that the agent of the surety company had anything whatsoever to do with the conduct of Barber in procuring the signatures of Coker and Wright to the indemnity agreements. Even if there were it would be doubtful if he was authorized to bind the surety company in that respect.
In People v. Rogers, 104 Fla. 462, 140 So. 205, 208, relied on by appellees, it was expressly said: "* * * if the opposite party has induced one by a trickery, fraud, or any kind of artifice, not to read the contract, with the view of obtaining from him a paper which he could not otherwise have obtained, the right to prove these circumstances, and thereby establish the fact that he was signing an entirely different paper, may be shown for the purpose of relieving such party from the obligation thus fraudulently obtained." (Emphasis added.) There is no proof that this alleged deception was practiced on Coker and Wright "by the opposite party." There is no proof that Barber, in his alleged deception of Coker and Wright, represented the "opposite party." As far as the evidence goes Barber was representing himself  not the "opposite party"  and his status and relationship was well known to both Coker and Wright.
In Corbin on Contracts (Sec. 607) it is said:
"One who signs or accepts a written instrument without reading it with care is likely to be surprised and grieved at its contents later on. In most cases he has been held bound in accordance with its written terms."
Morgan v. Mengel Co., 1922, 195 Ky. 545, 242 S.W. 860, is squarely in point. It holds:
"A party to a written contract cannot defend against its enforcement on the ground that he signed it without reading it, unless he aver facts showing circumstances which prevented his reading the paper, or was induced by the statements of the other parties to desist from reading it."
The courts will not ordinarily protect those who with full opportunity to do so will not protect themselves. Glass v. Craig, 83 Fla. 408, 91 So. 332; George E. Sebring Co. v. Skinner, 100 Fla. 315, 129 So. 759; Stokes v. Victory Land Co., 99 Fla. 795, 128 So. 408.
Under the title, Contracts, 12 Am.Jur., 628, Sec. 137, it is said:
"Ignorance of the contents of an instrument does not ordinarily affect the liability of one who signs it. The rule is the same where a written instrument is accepted otherwise than by signing it. If a man acts negligently and in such a way as to justify others in supposing that the writing is assented to by him, he will be bound both by law and in equity, even though he supposes the writing is an instrument of an entirely different character. The courts appear to be unanimous in holding that a person who, having the capacity and an opportunity to read a contract, is not misled as to its contents and who sustains no confidential relationship to the other party cannot avoid the contract on the ground of mistake if he signs it without reading it, at least in the absence of special *511 circumstances excusing his failure to read it. If the contract is plain and unequivocal in its terms, he is ordinarily bound thereby. It is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may, and probably will, pay his money and shape his action in reliance upon the agreement. To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts. The purpose of the rule is to give stability to written agreements and to remove the temptation and possibility of perjury, which would be afforded if parol evidence were admissible. This rule has been carried to the extent of holding that in the absence of fraud or circumstances savoring of fraud, one entering into a contract which refers for some of its terms to an extraneous document, outside the contract proper, is bound also thereby, notwithstanding he omits to inform himself as to the contents of that document or the nature of those terms and conditions when it is possible for him to do so. The rule that one who signs a contract is presumed to know its contents has been applied even to contracts of illiterate persons on the ground that if such persons are unable to read, they are negligent if they fail to have the contract read to them. If a person cannot read the instrument, it is as much his duty to procure some reliable person to read and explain it to him, before he signs it, as it would be to read it before he signed it if he were able to do so, and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents."
And in Johnson v. Green, Fla. 1951, 54 So.2d 44, 46, this Court said:
"* * * equity will not grant relief where the mistake complained of resulted from the want of care or that degree of care and diligence which could be exercised by persons of reasonable prudence under the same circumstances."
The decree is reversed for proceeding not inconsistent with this opinion and the cases of Crosby v. Orange State Oil Co., 1947, 158 Fla. 551, 29 So.2d 634 and Orange State Oil Co. v. Crosby, 1947, 160 Fla. 664, 36 So.2d 273, are overruled.
DREW, C.J., and TERRELL, THOMAS, THORNAL and O'CONNELL, JJ., concur.
HOBSON, J., not participating.