465 So.2d 581 (1985)
Ronald D. TAYLOR, Sr., Appellant,
v.
KENCO CHEMICAL & MFG. CORP. and Emerald Manufacturing Co., Inc., Appellees.
No. AX-66.
District Court of Appeal of Florida, First District.
March 14, 1985.
*583 C. Ray Greene, Jr., of Greene, Greene, Falck & Coalson, Jacksonville, for appellant.
Stephen D. Busey, of Smith & Hulsey, Jacksonville, for appellees.
JOANOS, Judge.
This is an appeal from a summary judgment on a counterclaim in a suit brought by Emerald Manufacturing Company, Inc. and Kenco Chemical and Manufacturing Corporation ("Rid-a-Bug") (hereinafter the "buyers") against Ronald D. Taylor, Sr., founder and seller of the company, ("Taylor"). The issues raised on appeal are (1) whether the acceptance of a portion of the benefits of a contract to which a party is entitled creates an estoppel or waiver of the party's right to the balance of the entitled benefits, (2) whether a party may recover compensatory and punitive damages in a suit for deceit arising out of a contract, and (3) whether acceptance of the benefits of a contract from which tort damage arose creates an estoppel or waiver of a right to tort damages. We affirm in part and reverse in part.
Since this is an appeal from a counterclaim, we view the evidence in a manner most favorable to Taylor, who was ruled against. Taylor began the business which *584 eventually came to be known as Kenco Chemical and Manufacturing Corporation, in Jacksonville in 1964. Initially, the business was a family operation, but by 1966 or 1967 sales had increased to such an extent that Taylor employed persons outside his immediate family. By 1979 Kenco employed forty to fifty full-time employees and fifty part-time employees, and realized annual sales of approximately six million dollars.
For about a year, from June 1978 until June 1979, Taylor gradually withdrew from the day-to-day operation of the business. On June 7, 1979, his efforts to move toward a semi-retirement were thwarted by a fire which completely destroyed the company's production facilities. For the remainder of 1979 and the early part of 1980, Taylor's family and employees put forth a concerted effort to restore production.
During this rebuilding period, Taylor also attempted to resolve the company's container difficulties, through development of a pocket bottle, a concept which he designed and eventually patented. Taylor initially assigned the task of the pocket bottle production to his son and to Hugh Patterson, an executive of Kenco. Later, the pocket bottle project was turned over to a friend, Drew Dugan, because Ronald Taylor, Jr. and Hugh Patterson were so involved with other company business they had been unable to make any progress on the container problem.
By January 1980 Taylor had decided to sell the business. The rebuilding process had entailed much personal effort, resulting in Taylor's hospitalization for two weeks. Taylor consulted a broker, who put him in contact with a number of potential buyers. Ultimately, Taylor sold Kenco to a local (Jacksonville) group of four individuals who specialize in finance and law. These individuals formed Emerald Manufacturing Company, Inc. for the purpose of buying Kenco. The decision to sell to the local group was based primarily on the group's assurances that the business would continue to operate with the same chief executives and employees that had been with Kenco and Taylor for a long period of time. In addition, the original agreement with these buyers contemplated a cash transaction.
As it turned out, the buyers were unable to complete the transaction on a cash basis, and asked Taylor to finance the deal. Taylor agreed to do so, and a complex financial package was put together. During negotiations the parties agreed that the rate of interest on the promissory note executed by the buyers to Taylor would be lower than the prevailing rate of interest, and the difference would be made up in a consulting agreement which retained Taylor in an advisory capacity for the term of the promissory note. The financing package was assembled by the buyers, with their tax consequences in mind. The promissory note provided for quarterly payments of principal and interest over a three-year period. Taylor alleges that during negotiations the parties also agreed that the consulting fees, which decreased as the principal was reduced, were to be paid on a quarterly basis coincident with the quarterly payments on the promissory note. In addition, the promissory note obligated the buyers to prepay the note to the extent of 50% of the annual combined net earnings, after tax, of Kenco and related companies acquired by the buyers from Taylor, as those earnings exceeded the aggregate principal payments made under the note during any fiscal year.
The final consulting agreement executed by the parties provided for annual rather than quarterly payment of fees. Taylor was unaware of the provision for annual consulting fees until the first payment was due and remained unpaid. It was at that point in January 1981, when Taylor contacted the buyers and protested the nonpayment of the consulting fee, that he was advised the contract provided for payment on an annual basis. Taylor immediately notified his attorney who, after checking the executed document, advised him that it did in fact provide for annual, rather than quarterly, consulting fees.
*585 The first annual payment on the consulting agreement was made in September 1981. According to Taylor, he discussed the error in the consulting agreement payment schedule with Ken Kirschner, an attorney and one of the buyers of Kenco. This discussion allegedly took place in October 1981 at a company party on board Taylor's yacht. Kirschner, who had drafted the final consulting agreement, indicated to Taylor that he knew the provision for annual consulting fees did not reflect the parties' intent, and he (Kirschner) hoped Taylor did not bear any ill will because of the error. Kirschner explained that Emerald (the company which had been formed to buy Kenco) was experiencing financial difficulties at that time; but he assured Taylor, when the final payment was made on the promissory note, Emerald would pay the $100,000 or $120,000 that Taylor could have received in interest over the intervening three years.
The sale of Kenco to Emerald was closed on September 25, 1980. In the spring of 1980 prior to the sale, Taylor arranged financing which enabled his friend, Drew Dugan, to form Drew Dugan Distributors, Inc. Drew Dugan Distributors was formed for the purpose of supplying Kenco with sprayers and bottles. On May 23, 1980, Taylor contracted with Drew Dugan Distributors for the purchase of sprayers and bottles. The companies that formerly supplied Kenco with containers were in the process of discontinuing the manufacture of farm and garden sprayers, and available alternative sources of supply would have cost Kenco considerably more than the contract entered into with Drew Dugan Distributors.
After the new owners had been operating Kenco for approximately a year, they negotiated a new contract with Drew Dugan Distributors for bottles and sprayers. Although the quantities contracted for ultimately proved excessive, since Kenco's sales did not increase to the extent that had been projected, the record reflects that Drew Dugan did not pressure Kenco to accept sprayers it did not need. Nevertheless, the Kenco owners (the buyers) approached Taylor about a possible buy-out of Drew Dugan Distributors. On the basis of this professed interest, Taylor made available to Kenco officials the records of Drew Dugan Distributing and Ronco Distributing, a subsidiary. Kenco did not make an offer to purchase  instead it contacted Drew Dugan's suppliers in an effort to deal directly with them.
In the summer of 1982 the buyers filed suit against Taylor. The buyers' principal allegations concerned violation of the consulting agreement, and specifically the supply contracts with Drew Dugan Distributors which obligated Kenco to purchase more sprayers than it needed. The sprayer contracts had been negotiated on the basis of projected needs viewed in the light of past sales. Kenco alleged that Taylor's interest in Drew Dugan Distributors resulted in the contract for excessive quantities of sprayers and constituted a violation of the terms of the consulting agreement. Taylor counterclaimed, seeking reformation of the consulting agreement, and alleging that Emerald had diverted Kenco's income in order to reduce net earnings and thus avoid prepayment obligations.
A jury trial was held on the allegations of the main complaint, and Taylor prevailed on the claims brought against him by the buyers. However, the buyers prevailed on their motion for summary judgment on Taylor's counterclaim. It is from the trial court's order awarding summary judgment that this appeal is taken.
In Count I of his counterclaim, Taylor sought reformation of Paragraph 4(a) of the consulting agreement. Paragraph 4(a) provides for annual payment of consulting fees, which Taylor claims was error, for the parties intended the consulting fees would be paid on a quarterly basis. The trial court denied reformation, on the basis of estoppel and waiver. First, the trial court cited the general rule that one who is able to read a written instrument and who has an opportunity to do so, is estopped from denying that he knows the contents, and accordingly is bound thereby. The trial *586 court's finding of waiver was premised on the court's determination that appellant accepted and retained the benefits of the consulting agreement as written and unduly delayed in formally asserting his rights.
In Count II of his counterclaim, Taylor sought compensatory and punitive damages, alleging that Kenco and Emerald had "systematically, intentionally and fraudulently diverted the income of Kenco" to avoid the prepayment obligation. The record reflects that Taylor's agreement with the buyers reserved to him or his appointed representative the right to examine the books and records of Kenco during the period the Kenco buyers were indebted to Taylor for the purchase price of the company. Yet after the buyers filed suit, Taylor was denied access to these materials. The record also reflects that Kenco enjoyed record sales during 1981 and 1982, but no pre-payment was made pursuant to the pre-payment provision of the promissory note. The trial court determined that appellant's basic claim was that of non-payment of sums Kenco and Emerald were contractually obligated to pay. The court viewed the claim as a breach of contract action, and held therefore that punitive damages were not recoverable. The court further found that in May 1983 Taylor accepted payment of all principal and interest due on the note, so deemed no compensatory damages recoverable on Count II.
Summary judgment is proper only in circumstances where "there is no genuine issue as to any material fact," Florida Rule of Civil Procedure 1.510(c), or "different inferences [which] may be drawn therefrom." Grady v. Humana, Inc., 449 So.2d 984 (Fla. 1st DCA 1984); Aldridge v. Yellow Cab of Gainesville, Inc., 448 So.2d 1129 (Fla. 1st DCA 1984); Gravas v. Mackle Co., Inc., 444 So.2d 1159 (Fla. 3d DCA 1984). The inquiry regarding existence of a genuine issue of material fact is addressed to the grounds asserted in the motion as supported by the pleadings, depositions, answers to interrogatories, admissions, affidavits supporting or opposing the motion, legal presumptions, and the principles of substantive law. Florida Rule of Civil Procedure 1.510(c); Mintzer v. Dade Federal Savings & L. Ass'n of Miami, 212 So.2d 319 (Fla. 3rd DCA 1968). The burden is on the moving party and any doubt must be resolved against the movant. Jones v. Stoutenburgh, 91 So.2d 299 (Fla. 1957); Connell v. Sledge, 306 So.2d 194 (Fla. 1st DCA 1975), cert. dismissed, 336 So.2d 105 (Fla. 1976).
In granting the buyers' motion for summary judgment on Count I of the counterclaim, the trial court found first that appellant was estopped from denying knowledge of the contents of the written consulting agreement, since he had not shown he was unable to read the agreement before signing it, nor had he shown that he was prevented from reading it. The trial court cited Allied Van Lines, Inc. v. Bratton, 351 So.2d 344, 347-348 (Fla. 1977), in which the Florida Supreme Court said:
Unless one can show facts and circumstances to demonstrate that he was prevented from reading the contract, or that he was induced by statements of the other party to refrain from reading the contract, it is binding. No party to a written contract in this state can defend against its enforcement on the sole ground that he signed it without reading it. All Florida Surety Company v. Coker, 88 So.2d 508 (Fla. 1956). (e.s.)
Estoppel in pais or equitable estoppel is the doctrine "by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he otherwise would have had." Black's Law Dictionary 483, 495 (5th ed. 1979). The elements of an estoppel are: "(1) words and admissions, or conduct, acts, and acquiescence, or all combined, causing another person to believe in the existence of a certain state of things; (2) in which the person so speaking, admitting, acting, and acquiescing did so wilfuly [sic], culpably, or negligently; and (3) by which such other person is or may be induced to act so as to change his own previous position injuriously." 22 Fla.Jur.2d Estoppel *587 and Waiver § 31 (1980). Unlike waiver, an essential to estoppel is a reliance on the words or conduct of a party which causes a detrimental change in position for the party so relying.
There are circumstances in this case which would explain appellant's delay in pursuing the quarterly consulting payments  and these circumstances make estoppel inapplicable. The record shows that Taylor protested the annual payment provision in the consulting agreement. He stated he received assurances that when Kenco was in a more favorable financial position, he would receive the amounts which he would have earned in interest had the payments been made on a quarterly basis. Taylor's acceptance of annual payments constituted an acceptance of benefits to which he was legally entitled and was not inconsistent with his position that the parties intended the contract to provide for quarterly payments. Also, the buyers were advised as early as January 1981, when the first payment was due, that Taylor disputed the annual payment provision. The record reflects that the matter was again discussed in October 1981. There is evidence that Taylor repeatedly maintained to the buyers that the parties had agreed the consulting agreement payments would be on a quarterly basis. On these facts, the buyers cannot credibly argue a detrimental change in position due to their reliance on Taylor's acceptance of annual payments.
Next, the trial court found Taylor waived his right to reformation of the consulting agreement since he had "accepted and retained the benefits of the Consulting Agreement as written and unduly delayed in moving to have his rights formally asserted." In so holding, the trial court found that Taylor became aware of the alleged mistake in the consulting agreement as early as January 1981, when the first quarterly payment on the promissory note was made and the consulting agreement remained unpaid. The court noted that although Taylor communicated his grievance to an Emerald shareholder in October 1981, Taylor accepted annual payments due on the consulting agreement in September 1981 and 1982, and took no action on the alleged mistake until December 3, 1982, when he filed his counterclaim seeking reformation.
Waiver is the intentional or voluntary relinquishment of a known right, or conduct which infers the relinquishment of a known right. Thomas N. Carlton Estate v. Keller, 52 So.2d 131 (Fla. 1951); Enfinger v. Order of United Commercial Travelers, 156 So.2d 38 (Fla. 1st DCA 1963); Fireman's Fund Insurance Company v. Vogel, 195 So.2d 20 (Fla. 2d DCA 1967). The essential elements of waiver are (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right. Gulf Life Insurance Company v. Green, 80 So.2d 321 (Fla. 1955); Gilman v. Butzloff, 155 Fla. 888, 22 So.2d 263 (1945); Wilds v. Permenter, 228 So.2d 408 (Fla. 4th DCA 1969). Waiver may be express, or implied from conduct or acts that lead a party to believe a right has been waived. Thomas N. Carlton Estate, supra; Davis v. Davis, 123 So.2d 377 (Fla. 1st DCA 1960). However, when waiver is to be implied from conduct, "the acts, conduct, or circumstances relied upon to show waiver must make out a clear case." Fireman's Fund Insurance Co., supra, at 24, citing Gilman v. Butzloff, supra.
Application of the elements of waiver to this case demonstrates first that at the time of the alleged waiver, a right existed with regard to a contract term. Second, Taylor became aware of the mistake which gave rise to a right of reformation in January 1981, shortly after the first quarterly payment was due. The trial court apparently considered that the third element, the intention to relinquish a right, was implicit from Taylor's conduct in accepting two annual payments before taking formal action to assert his right to reformation. In holding that by this conduct Taylor waived a right to reformation, the *588 trial court has failed to consider Taylor's statements to the contrary as they appear in his lengthy deposition of October 4, 1982. In this deposition Taylor stated that he protested the buyers' failure to make the quarterly consulting fee payment in January 1981, and was thereupon advised that the final agreement provided for annual payments. Taylor claims he received assurances from the buyers that he would receive the total amounts due him by the time the final payment was made on the promissory note. The record reflects that one month after accepting the first annual payment, Taylor discussed the quarterly payments with one of the buyers  who acknowledged that the consulting agreement as drafted did not reflect the parties' intent and again assured Taylor that he would receive, by 1983 or sooner, the amount he could have received in interest had the payments been made on a quarterly basis. According to Taylor the Kenco buyers represented they were unable to make quarterly payments at that time (1981) and asked him to wait until the final payment was due.
The depositions of the Kenco buyers corroborate Taylor's assertion that the Consulting Agreement had been designed to make up the difference between the six per cent (6%) promissory note rate of interest and the prevailing market rate of interest of sixteen per cent (16%).[1] The promissory note contains a schedule of quarterly payments, beginning January 5, 1981, with the final payment due October 5, 1983. A reasonable inference could be drawn that this quarterly payment schedule had been intended to apply as well to payments due on the Consulting Agreement.
Finally, with regard to the trial court's finding of undue delay in asserting the right to reformation, Taylor correctly notes that his counterclaim was filed in December 1982 months before the final payment on the promissory note was due, and at the point when Taylor recognized that the buyers did not intend to honor the agreement as negotiated. Taylor's conduct in allowing the buyers additional time to meet their obligation on the consulting agreement is consistent with his earlier agreement (1) to finance the deal for the local group, and (2) to accept less than the prevailing rate of interest to accommodate the local buyers.
We are of the opinion that Taylor's conduct does not make out that requisite clear case which would show that he intended to relinquish his right to reformation.[2] The circumstances of this case are somewhat atypical in that the written agreements are complex, lengthy, and the subject of considerable redrafting. The first agreement between the parties provided for a cash sale. When the buyers were unable to obtain a sufficient letter of credit, they asked Taylor to finance the sale. Taylor agreed, and one of the buyers, a financier, structured the financing package for the purchase of Kenco. Given this set of circumstances, Taylor's failure to read the redraft of an agreement that already had been reviewed extensively does not constitute a waiver.
In Count II of his counterclaim Taylor sought compensatory and punitive damages, alleging that the Kenco buyers had diverted Kenco income to avoid the prepayment provision of the promissory note. The trial court held the claim was for breach of contract rather than an action for fraud and deceit, since appellant's claim was essentially that the Kenco buyers "did not pay him sums which they were contractually obligated to pay." The claim for punitive damages was denied by the trial court, since punitive damages are not recoverable in a contract action. Lewis v. *589 Guthartz, 428 So.2d 222, 223 (Fla. 1982). The trial court also denied compensatory damages finding that in May 1983 appellant "accepted payment in full of all principal and interest due on the note," so no compensatory damages were deemed recoverable on Count II.
Relief may be had for fraudulent representation if the following elements are shown:
(1) a false statement concerning a specific material fact;
(2) the representor's knowledge that the representation is false;
(3) an intention that the representation induce another to act on it;
(4) consequent injury by the other party acting in reliance on the representation.
Shee-Con, Inc. v. Al Seim Appraisal Service, 427 So.2d 311, 312 (Fla. 5th DCA 1983). Fraud contemplates an intent to deceive, however, "[c]onstructive fraud may exist independently of an intent to defraud." Harrell v. Branson, 344 So.2d 604, 606 (Fla. 1st DCA 1977). Constructive fraud is a term applied to a wrongful transaction having similar attributes or effects as actual fraud, and "is deemed to exist where a duty under a confidential or fiduciary relationship has been abused." Id. 607.
In order to recover punitive damages in a suit on a contract, the tort action must arise from conduct that is independent of the conduct which constitutes a breach of contract. Lewis v. Guthartz, at 223; American International Land Corporation v. Hanna, 323 So.2d 567 (Fla. 1975). The rationale for the rule, even in cases of willful and intentional breach, is "an unwillingness to introduce uncertainty and confusion into business transactions as well as the feeling that compensatory damages as substituted performance are an adequate remedy for an aggrieved party to a breached contract." Lewis v. Guthartz, at 223.
Taylor has presented a fact situation which conceivably supports an allegation of constructive fraud. He alleges that he relied on the representations of the Kenco buyers that they intended to rectify the mistake in the final draft of the consulting agreement at or before the time final payment was due. If the buyers did in fact make such a representation, the circumstances indicate (1) the buyers made the representation knowing it to be false, (2) the buyers intended to forestall any action by Taylor to correct the annual payment provision in the consulting agreement, and (3) Taylor was injured by acting in reliance on the buyers' assurances. The buyers argue on the other hand, that even if they were remiss in failing to make prepayments, or even if they did so intentionally, Taylor received and accepted full interest at the contract rate and consequently suffered no damage as a result of the alleged failure to make earlier payments. Even without regard to the prepayment provision, the provision for annual rather than quarterly consulting fee payments resulted in a loss to Taylor of $100,000 to $120,000. Clearly, the buyers intended Taylor to be bound by the provision for annual payments, and Taylor's reliance that the final draft of the contract would reflect the parties' intent, as he alleges it to be, resulted in a substantial change in his position.
The final element for a finding of constructive fraud is the existence of a confidential or fiduciary relationship. The circumstances here suggest that a qualified form of confidential relationship did exist between Taylor and the Kenco buyers during the time period relevant to this action. Taylor stated that he decided to sell to these particular buyers because they were local people who had expressed an intention to operate his business with the employees who had been with him for a long period of time. The fact that Taylor agreed to finance the sale personally is an indicator of his confidence in the business integrity of the local buyers. Thus it is possible to infer that Taylor, who clearly identified his own interests with those of Kenco, believed himself to be in a confidential relationship with the Kenco buyers. Arguing against a finding of confidential relationship is the *590 fact that not only are all parties to this action experienced businessmen, but also that Taylor was represented by counsel throughout each stage of the transaction.
To prevail on his claim for punitive damages, Taylor must show first, that the buyers perpetrated a tort; and second, that the alleged tortious conduct arose independently of the conduct which constitutes a breach of contract. Lewis v. Guthartz, supra; American International Land Corp. v. Hanna, supra. Here, Taylor's allegations of the tortious conduct of fraud and deceit require a finding of constructive fraud  which in turn rests upon a finding of a confidential relationship. Due to circumstances peculiar to this case the question of the existence of a confidential relationship between Taylor and the Kenco buyers is close. We find it unnecessary to decide the question, however, because the alleged tortious conduct of fraud and deceit arose from the same conduct which allegedly constitutes a breach of contract. Therefore, we find no error in the denial of Taylor's claim for punitive damages. The question of Taylor's entitlement to compensatory damages will be determined by the outcome of our ruling on the Count I claim for reformation. We find there were genuine issues of material fact to be decided with regard to Count I, and that Taylor is entitled to have a jury determine whether his conduct was consistent with an intent to waive any right to reformation of the consulting agreement. The jury's determination with regard to the reformation question will also determine whether Taylor is entitled to the sums that would have been earned in interest on quarterly consulting agreement payments. Therefore, we find it unnecessary to rule on the trial court's findings that Taylor was not due compensatory damages.
We reverse that portion of the trial court's order which granted summary judgment as to Count I of the counterclaim, and affirm that portion of the order which denied punitive damages.
Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.
WIGGINTON and NIMMONS, JJ., concur.
NOTES
[1] The order granting appellees' motion for summary judgment was entered December 13, 1983, and the depositions of the Kenco buyers were not taken until December 27, 1983, so the trial court did not have the owners' depositions available when considering the motion. The record reflects that appellant and his counsel encountered considerable difficulty in sheduling these depositions, for the Kenco owners interposed delays on more than one occasion.
[2] Fireman's Fund Insurance Company v. Vogel, 195 So.2d 20 (Fla. 2d DCA 1967).