ROTHENBERG, J.
 

 Jairo Addison (“Addison”), the appellant here and the plaintiff below, was involved in a business venture with Joe and Jussara Carballosa (“the defendants”). Addison contends he was tricked into signing a contract that did not reflect the parties’ actual agreement concerning this business venture. After reviewing the pleadings and the record evidence, and considering the arguments of counsel, the trial court granted final summary judgment in favor of the defendants. We affirm.
 

 Although Addison: (1) executed the Compensation Agreement at issue on July 26, 2006; (2) admits he was provided with a full and fair opportunity to read the Compensation Agreement before he signed it; (3) admits the defendants did nothing to hide the terms and conditions of the Compensation Agreement; (4) admits he reads and speaks English and the Compensation Agreement is in English; (5) does not deny that the Compensation Agreement was emailed to him for review before he went to the defendants’ home to sign it; (6) admits he received a copy of the signed Compensation Agreement to take with him when he left the defendants’ home; (7) the terms and conditions of the three page Compensation Agreement are clear, unambiguous, and conspicuous; and (8) he did nothing to contest the terms and conditions of the Compensation Agreement until he was terminated from the company over one year later, he contends that the trial court erred in granting summary judgment in favor of the defendants on the basis that there exists a material issue in dispute as to whether Addison was “tricked into signing a contract that did not reflect the parties’ actual agreement concerning [their] business venture.” We disagree with Addison, and conclude that
 
 *953
 
 summary judgment was properly granted in this case.
 

 Our analysis begins, as it must, with a review of the pleadings, which without question are at odds with the evidence. In the general allegations of Addison’s Second Amended Complaint (“Complaint”), Addison alleges:
 

 14. On July 26, 2006, JOE and JUS-SARA CARBALLOSA invited Plaintiff to their home for the signing of the Ownership Agreement. The CARBALLOSAS presented Plaintiff with a document that they represented to be the very same Ownership Agreement emailed to Plaintiff on June 19, 2006 (see paragraph 12,
 
 supra.).
 
 Due to Plaintiffs trust in JOE CARBAL-LOSA and Plaintiffs belief that JOE CARBALLOSA was his close friend, Plaintiff signed the Agreement, unknowingly relying on JOE CARBALLOSA’S misrepresentation that the document was identical to the Agreement emailed to Plaintiff on June 19, 2006.
 

 15. The document that Plaintiff was fraudulently induced into signing was, in fact, NOT identical to the document emailed to Plaintiff on June 19, 2006....
 

 (emphasis added).
 

 Count I, which is entitled “FRAUD (MISREPRESENTED CONTRACT),” re-avers and alleges paragraphs one through thirty, and additionally alleges:
 

 32.On July 26, 2006, at a meeting at the home of the CARBALLOSAS, the Defendants misrepresented to the Plaintiff that the “Compensation Agreement,” dated July 26, 2006 (attached hereto as Exhibit “B”), was the “Ownership Agreement,” dated June 19, 2006 (attached hereto as Exhibit “A”), when, in fact, the documents are different.
 

 33. Defendants, the CARBALLOSAS, knew that the “Compensation Agreement” and the “Ownership Agreement” were not identical.
 

 34. Defendants, the CARBALLOSAS, intended that their misrepresentation of the “Compensation Agreement” as being the “Ownership Agreement” emailed to Plaintiff on June 19, 2006, would induce the Plaintiff to rely on their misrepresentation and to sign the “Compensation Agreement” instead of the “Ownership Agreement.”
 

 35. The Plaintiff has been denied his rightful 33% ownership of MODERN NATURE DESIGN, INC. due to the fact that Plaintiff had read the “Ownership Agreement” and agreed to its terms, and justifiably relied upon the CARBALLO-SAS’ representation that the “Compensation Agreement” document was identical to the “Ownership Agreement.”
 

 (emphasis added).
 

 As is clearly evident, Addison’s Complaint alleges that the defendants committed a “fraud” based on the following facts: on June 19, 2006, the defendants emailed him an agreement; on June 26, 2006, the defendants invited him to their home to sign the agreement; when the defendants presented Addison with the agreement, they represented that it was “the very same” agreement they emailed to him on June 19, 2006; Addison justifiably relied on their representations; and he signed the agreement.
 

 Based on the discovery conducted by the defendants, Addison has admitted that these allegations are false. Addison admitted in his sworn deposition that an
 
 *954
 
 agreement was emailed to him on June 19, 2006. However, he refused to sign this agreement because he did not agree to the terms. He further admits that after negotiations with Mr. Carballosa, the parties agreed to make changes to the terms of the original agreement, and when he signed the agreement that was presented to him on June 26, he knew it was not “the very same” agreement the defendants had emailed to him on June 19. Addison, however, claimed in his deposition that the changes he had agreed to were not the changes that were reflected in the June 26 agreement that he signed. Addison’s admissions are completely inconsistent with, and contrary to, the allegations in Addison’s Complaint. Thus, summary judgment was properly granted.
 
 See Assad v. Mendell,
 
 550 So.2d 52, 53 (Fla. 3d DCA 1989).
 

 In
 
 Assad,
 
 the appellants (“buyers”) purchased a home from the appellees (“sellers”). After the buyers discovered leaks from the roof, they brought an action alleging that the sellers had fraudulently misrepresented the conditions of the roof to induce them to close the transaction. However, when the buyers were deposed, their deposition testimony conflicted with the allegations in their complaint. The trial court granted summary judgment, and this Court affirmed, finding that “[t]he buyers were bound by the issues as framed by their pleadings. The function of a motion for summary judgment is to determine if the respective parties can produce sufficient evidence in support of the operative issues made in the pleadings.”
 
 Id.
 
 at 53-54.
 

 Because Addison’s sworn testimony completely refutes the allegations in his Complaint, and there is no record evidence that supports the allegations contained in his Complaint, the trial court properly granted summary judgment in favor of the defendants.
 

 We also conclude that even if Addison had amended his Complaint to comport with his subsequent sworn testimony (which he clearly did not do), the trial court correctly granted the defendants’ motion for summary judgment. To establish a claim of fraudulent inducement, Addison had the burden to show that: (1) the defendants misrepresented a material fact; (2) the defendants knew or should have known that the representation was false; (3) the defendants intended that the misrepresentation would induce Addison to sign the Compensation Agreement; (4) Addison signed the agreement in justifiable reliance on the misrepresentation; and (5) Addison was injured.
 
 Hall v. Burger King Corp.,
 
 912 F.Supp. 1509, 1521 (S.D.Fla.1995). Based on Addison’s own sworn testimony and the record in this case, Addison failed to establish his claim of fraudulent inducement as a matter of law.
 
 See M/I Schottenstein Homes, Inc. v. Azam,
 
 813 So.2d 91, 95 (Fla.2002) (“Where the pleadings of the parties make it evident that reliance on the part of a purchaser was not justified as a matter of law, a trial court may certainly be correct in ruling as a matter of law that no cause of action exists.”).
 

 One who signs a contract is presumed to know its contents.
 
 Hall,
 
 912 F.Supp. at 1512. That is because it is generally the duty of a party to a contract to learn and understand its contents before he signs it.
 
 Pepple v. Rogers,
 
 104 Fla. 462, 140 So. 205, 208 (1932);
 
 see also Parham v. E. Bay Raceway,
 
 442 So.2d 399, 400-01 (Fla. 2d DCA 1983). “It thus follows that a party to a written contract cannot defend against its enforcement on the sole ground that he signed it without reading it.”
 
 Parham,
 
 442 So.2d at 401 (citing
 
 All Fla.
 
 
 *955
 

 Surety Co. v. Coker,
 
 88 So.2d 508, 510 (Fla.1956)).
 

 However, if a party to a written contract was prevented from reading it or he was fraudulently induced to sign the contract without reading it due to misrepresentations upon which he justifiably relied, he may be able to defend against its enforcement.
 
 Parham,
 
 442 So.2d at 401. Justifiable reliance, however, does not permit the recipient of a fraudulent misrepresentation to blindly rely on it.
 
 Uvanile v. Denoff,
 
 495 So.2d 1177, 1180 (Fla. 4th DCA 1986). Thus, “a misrepresentation is not actionable where its truth might have been discovered by the exercise of ordinary diligence.”
 
 Wasser v. Sasoni,
 
 652 So.2d 411, 412 (Fla. 3d DCA 1995);
 
 see also Steinberg v. Bay Terrace Apartment Hotel, Inc.,
 
 375 So.2d 1089, 1092 (Fla. 3d DCA 1979).
 

 In addressing the justifiable reliance element of a fraudulent inducement claim in
 
 M/I Schottenstein,
 
 the Florida Supreme Court reaffirmed its earlier position in
 
 Besett v. Basnett,
 
 389 So.2d 995, 997 (Fla.1980), and recognized that “there may be cases in which the falsity of a statement is obvious, and under those circumstances no cause of action could be stated, [and] it would be entirely proper for a trial court to rule against the plaintiff as a matter of law.”
 
 M/I Schottenstein,
 
 813 So.2d at 95;
 
 see also Wasser,
 
 652 So.2d at 413 (noting that “a negligent purchaser is not justified in relying upon a misrepresentation which is obviously false, and ‘which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation’ ”) (quoting
 
 Besett,
 
 389 So.2d at 997);
 
 Gonzalez v. Patane,
 
 234 So.2d 8, 8 (Fla. 3d DCA 1970) (finding no cause of action for misrepresentation where the purchasers failed to exercise diligence to discover readily available information).
 

 Specifically addressing the record in the instant case, Addison alleges in his Complaint that when he signed the Compensation Agreement on June 26, 2006, the defendants represented to him that this was “the very same” agreement they had emailed to him on June 19, 2006, and in reliance on this representation, he signed the Compensation Agreement without reading it. Addison now admits that he did not agree to the terms contained in the proposed agreement (“Ownership Agreement”) sent to him on June 19; the parties renegotiated the terms of their proposed business venture after June 19; he knew the agreement he signed on June 26, was not “the very same” agreement that was sent to him on June 19; and when he signed the Compensation Agreement on June 26, he knew the terms were not the same as the Ownership Agreement originally sent to him on June 19. He now contends, contrary to the allegations in his Complaint, that the parties had agreed to make Addison an officer of the company after eighteen months; this was the only change the parties agreed would be made to the parties’ Ownership Agreement; and he signed the Compensation Agreement on June 26, believing that this was the only change made, and therefore, not realizing that the agreement he was signing did not give him an ownership interest in Modern Nature Design, Inc.
 

 Putting aside the clear conflict between the Complaint and Addison’s sworn testimony, a cursory review of the two documents reveals that they are completely different. The document emailed to Addison on June 19, is titled in large bold print: Modern Nature Rugs, Inc. Compensation Agreement. In contrast, the document emailed to Addison on June 26, is titled in large bold print: Modern Nature Rugs, Inc. Ownership Agreement. The terms and conditions of these very brief, three page documents are entirely different and readily apparent. In fact, each
 
 *956
 
 and every paragraph has been materially changed.
 

 Addison admits that the defendants sent him the Ownership Agreement on June 19, he reviewed the proposed agreement, he did not agree to the terms, and the parties renegotiated the agreement. The defendants aver that the revised agreement, which was changed from an Ownership Agreement to a Compensation Agreement, was emailed to Addison for his review prior to June 26. Addison does not dispute this claim; he does not remember one way or the other. Addison does admit, however, that before he signed the Compensation Agreement he was provided with a full and fair opportunity to read it, the defendants did nothing to hide the terms and conditions contained in the Compensation Agreement, the Compensation Agreement is in English, he reads and speaks English, and he was immediately given a copy of the Compensation Agreement after the parties signed it.
 

 Addison also admits that Joe Carballosa specifically pointed out to him the change the parties agreed to: that Addison would be made an officer of the company after he worked for the company for eighteen months. Importantly, this provision is contained on the first page of the Compensation Agreement that clearly and boldly identifies itself as a “Compensation Agreement,” not an “Ownership Agreement,” and the section that contains the “officer” provision is contained in section three on the first page. Section three of the Compensation Agreement is boldly headed with the words “Compensation Due to Jairo Addison,” whereas section three of the “Ownership Agreement” is boldly headed with the words: “Ownership Share and Profit Distribution.” The differences between the two documents were readily apparent, and were, in fact, highlighted by the defendants.
 

 Thus, Addison had a duty to read the Compensation Agreement before he signed it,
 
 see Pepple,
 
 140 So. at 208;
 
 Parham,
 
 442 So.2d at 400-01. Because the changes to the document were obvious, with the exercise of ordinary diligence, any misrepresentation as to its content was easily discoverable. It was therefore entirely proper for the trial court to rule against Addison as a matter of law and to grant summary judgment in favor of the defendants.
 
 M/I Schottenstein,
 
 813 So.2d at 95; Besett, 389 So.2d at 997; Wasser, 652 So.2d at 413;
 
 Uvanile,
 
 495 So.2d at 1180;
 
 Gonzalez,
 
 234 So.2d at 9.
 

 We note that the United States District Court came to the same conclusion in
 
 Hall.
 
 In
 
 Hall,
 
 the plaintiffs brought an action against Burger King Corporation. Burger King filed a motion for summary judgment seeking dismissal of the plaintiffs’ claims on grounds that they were barred by the general release signed by the parties. The plaintiffs sought to set aside the release, contending that an employee of Burger King misrepresented the nature of the release and fraudulently induced them to sign it. The United States District Court concluded that even if the representations were false, and these representations induced the plaintiffs to sign the release, their reliance was unjustified where the terms were clear.
 
 Hall,
 
 912 F.Supp. at 1521-22.
 

 Therefore, even assuming
 
 arguendo
 
 that someone at BKC represented to plaintiffs that this agreement only canceled the lease at Burger King® Restaurant No. 561, even a cursory reading of this two (2) page document would have shown this representation to be in conflict with the agreement’s plain terms. The agreement is boldly entitled “Agreement of Cancellation and Termination of Lease/Sublease Agreement and General Release”. Further, Para
 
 *957
 
 graph 2 of the agreement explicitly provides that the parties to it were mutually releasing each other from “any and all claims whatsoever in law or in equity” which they had against each other arising out of “any ... cause or circumstance”.
 

 Under these circumstances, plaintiffs’ alleged reliance on BKC’s purported misrepresentation was unreasonable as a matter of law.
 

 Hall,
 
 912 F.Supp. at 1521-22.
 

 In conclusion, we quote from the Restatement (Second) of Torts § 541, cmt. a (1977): “[I]f one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect.”
 

 Affirmed.