450 So.2d 251 (1984)
Conrad A. KIES and Janet Kies, Appellants,
v.
Marvin A. HOLLUB, R.A. Davenport, Sr., & James Stoker, d/b/a Architectural Control Committee, and Pine Bay South Association, Inc., Appellees.
No. 82-2569.
District Court of Appeal of Florida, Third District.
April 17, 1984.
*252 Roger A. Bridges, Coral Gables, for appellants.
Schultz & Hollander and Howard Hollander and Robert A. Solove, Miami, for appellees.
Before SCHWARTZ, C.J., and HUBBART and FERGUSON, JJ.

ON MOTION FOR REHEARING
FERGUSON, Judge.
Appellants purchased a lot and constructed a $700,000 residence in a subdivision of luxurious custom designed homes. The neighborhood is quiet and secluded with no common recreational facilities. The subdivision is also subject to a Declaration of Restrictions which is recorded in the county's Official Records.[1] Appellants' plans *253 for construction of the home included a tennis court which was approved by the Architectural Control Committee of the subdivision. The plans did not include the erection of lights for the tennis court. Subsequently, appellants applied for and received from the County Commission a variance for construction of tennis court lights based on a plan indicating four 16-foot high light poles with two lamps each. After obtaining the variance appellants erected eight 20-foot light poles which violated the County Commission's variance permit, and as appellees contend, violated the Declaration of Restrictions as well.
The Architectural Control Committee ordered appellants to remove the light poles. Appellants refused and instead sought another variance for the 20-foot poles, which was approved by a zoning official but overturned by the Zoning Appeals Board.
Appellees, members of the Architectural Control Committee, brought this action for injunctive relief seeking to prohibit the "intended lighting facilities" on appellants' tennis court. Appellees alleged that the facilities were being constructed without their approval after appellants were reminded of the requirement for such approval under the Declaration of Restrictions. After a hearing on the merits, which included testimony of expert witnesses and a video taped view of appellants' lights and the surrounding area, the trial court entered a final judgment ordering appellants to remove the light poles within thirty days, finding in part that:
III... . The Plaintiffs have not acted in bad faith and do not appear to have been arbitrary or unreasonable... . The comprehensive nature of the restrictions obviously reflects the desire to see that the subdivision remains a high class residential area. [cites omitted].
We dispense with a preliminary question, i.e., whether appellants should have first submitted the plan for lighting to the Committee. It was agreed at oral argument that even if appellants had submitted plans for a tennis court which included lighting, the plan would have been rejected forthwith. Furthermore, as appellees contend, the appellants proceeded at their own risk in constructing the lighting facilities without the approval of the Committee.
The principal issue is whether the installation of lights on an approved tennis court is, within a reasonable reading of the Declaration of Restrictions, a structural improvement[2] which required prior approval of the Architectural Control Committee,[3] and even if so, whether the Committee's refusal to approve of the lighting after learning of appellants' intent to construct the facilities was arbitrary or unreasonable.
The primary reasons given by the Architectural Control Committee for opposing the appellants' tennis court lighting were: (1) to protect the community from nuisances; and (2) to maintain the aesthetic quality of the homes.
Appellees called as a witness Professor Ralph Warburton, who is an architect, engineer, city planner and professor. On cross-examination his testimony in pertinent part was:
Q. Let me ask you to assume that there are scattered throughout Gables Estates [another community of luxurious homes] tennis court lots in the backyards of people's homes which are very similar *254 to these Mr. and Mrs. Kies are installing. Would that in any way change your opinion as to whether in this area of Pine Bay Estates South, which is a well-to-do neighborhood, these tennis court lights should not be permitted?
A. I would have to review the situation to know on its merits. I would have to consider the size of the lots, whether the lots were on an historic highway, what kind of landscaping was provided on the lots to perhaps screen any lighting from the streets or adjacent lots. I would have to consider a number of those kinds of factors before I could reach that decision.
* * * * * *
Q. I am asking you to assume that through landscaping or through any other means less than one-third of a foot candle[4] of light would be permitted to spill over from Mr. and Mrs. Kies' lot to any adjoining lot. I am asking you to assume it. Now, based on that assumption, does that in any way then change your opinion as to whether such tennis court lights should be permitted?
A. Not greatly on two counts. One, it does not handle the problem of daylight, the daylight view of the court.
The second is that we are dealing with the light source itself, the brightness of the light source as compared with the dark sky. And we are not dealing with the illumination of the grass, we are dealing with the appearance of the neighborhood, the brightness of the light source against the sky. And if that could be reduced, say the brightness of the light source against the sky was a ratio of only one to ten, one to three, you know, relatively the same grayness or blackness as the sky, then we would handle the nighttime problem.
Q. You mean above the light or below?
A. No, in the light, looking at the light.
For example, the contrast between the light and the ceiling, in order for it not to affect the neighborhood at night, this would have to be relatively no difference. There would be too much ____
Q. How about a one-third foot candle vertical escape at night? Would that be sufficient in your opinion?
A. Again, escape from what?
Q. Escape from the lot, from above the lights. One-third foot candle vertical escape, would that in any way change your opinion?
* * * * * *
A. No, I don't believe so.
Q. Let us talk about these daylight problems that you have. What color would you change these bulbs to to make them aesthetically acceptable?
A. I am not sure they could be made in this environment aesthetically acceptable. I am not sure they could be screened. I am not sure there is a space to do that between the present tennis court and the street.
To effectively do that in terms of colors, you would want them to of course blend as nearly as possible with the background in which they are going to be seen.
* * * * * *
Q. Professor, is there any color that Mr. and Mrs. Kies could paint these poles which would satisfy your objection as to the aesthetics of the color of the poles and, if so, please tell me what it is?
A. Probably not. There are colors that would help but no colors that would satisfy.
Q. Is it then your opinion that any tennis court light in any neighborhood could not be made a color which would be acceptable to your aesthetics in terms of your urban planning?
A. No.
* * * * * *
Q. In terms of the height, how high should these tennis court lights be to satisfy your aesthetics?

*255 A. You have the question of the size of the lot, you know. If this was a lot that was three times the size and the nice trees around it and it was screened from Old Cutler Road and from the neighbors and there was no visible or essentially no visible protrusion of this facility into the public and adjacent land, then I think maybe it would not matter what color they would be, what shape they were.
Appellants called three expert witnesses at trial. Chris Fergis, architect for the appellants, testified that in his opinion, the poles and lights as built were not aesthetically objectionable. Paul Powell, an engineer and licensed contractor, testified that the fixtures installed at appellants' home were known in the trade as a cut-off fixture developed to avoid light spillage onto adjacent property; that in his testing he found that light spillage onto the closest adjoining lot line was only 2/10th of a foot candle, which is even less than what is acceptable by county standards. Gene Gracer, a licensed real estate appraiser with over thirty years experience, testified that other even more expensive residential neighborhoods in Dade County have lighted tennis courts, and that the proper place for lighted tennis courts is affluent neighborhoods. It was his opinion that tennis court lights have no detrimental effect upon the value and desirability of other lots in the subdivision and "might even add a touch of prestigiousness to the neighborhood."
We are guided by two sometimes competing standards in reviewing the subject final judgment which grants permanent injunctive relief: (1) the granting of a mandatory injunction is within the sound discretion of the trial court and an appellate court will not intervene absent a showing that discretion has been abused, State Road Department v. Newhall Drainage District, 54 So.2d 48 (Fla. 1951); Turk v. Hysan Products Company, 149 So.2d 584 (Fla. 3d DCA 1963), and (2) covenants imposed by a general plan, restraining the free use of real property, although generally valid and enforceable, are not favored in the law and will not be honored by the courts unless the restraint is within reasonable bounds. Soranaka v. Cook, 343 So.2d 51 (Fla. 2d DCA 1977); Hagan v. Sabal Palms, Inc., 186 So.2d 302 (Fla. 2d DCA), cert. denied, 192 So.2d 489 (Fla. 1966). As to the first standard it is the appellants' burden to make a clear showing that discretion was abused, see Gould v. National Bank of Florida, 421 So.2d 798 (Fla. 3d DCA 1982), such as where there is no record evidence supportive of the court's factual findings. See Russo v. Clark, 147 So.2d 1 (Fla. 1962). As to the second standard, appellants again, as the party attacking an injunction to enforce a restrictive covenant, must demonstrate that the covenant, as interpreted and applied, is an unreasonable, arbitrary and capricious restriction on the free and enjoyable use of their real property.
It is an established rule of law, and not disputed here, that restrictive covenants incorporated into a deed, by which the grantor reserves the right to approve plans for improvement to the land, are valid and enforceable against the grantee absent a showing that the reserved right is unreasonable or arbitrary,[5] or is being exercised in an unreasonable or arbitrary manner. Engvalson v. Webster, 74 So.2d 113 (Fla. 1954).
Appellants have successfully carried their burden of showing that the reserved right is being exercised in an unreasonable or arbitrary manner. Other than a naked allegation, there is no showing whatever that appellants' tennis court lights constitute a nuisance. Unless a thing complained of is a nuisance per se, i.e. unlawful, *256 facts showing that it is a nuisance must be stated and proved. See Baum v. Coronado Condominium Association, Inc., 376 So.2d 914 (Fla. 3d DCA 1979).
The record is also devoid of an objective showing that appellants' lights are aesthetically disharmonious with the character of, or that they detract from, the quality of the neighborhood. Although Professor Warburton described the shape, height and color of the light poles as out of keeping with what could be considered "best practice in a community of this sort", he offered no view as to what shape, height or color of light poles would be acceptable. His conclusion, consistent with the view of the Architectural Control Committee, was that the tennis court lighting on appellants' lot was aesthetically detrimental given the size, location, and landscaping of the lot  an opinion which evaporates in substance when considered in light of the other expert evidence that tennis court lighting is common in affluent neighborhoods having similar characteristics, and that lighting even enhances property values. The testimony of Warburton and Hollub, while clear expressions of personal aesthetic preference, did not address the pertinent question as correctly perceived by the trial court  whether the presence of tennis court lights, for aesthetic reasons, detracted measurably from the character of the subdivision as "a high class residential area."
We find that (1) the erection of lighting on the approved tennis court was not expressly prohibited by the restrictive covenants and an intent to prohibit such lighting cannot reasonably be read into the covenants, (2) the tennis court lighting in this case was not shown to be a nuisance, (3) the allegation that the lighting was aesthetically detrimental is not supported by competent and substantial evidence, from all of which we must conclude that the Architectural Control Committee's disapproval was indeed arbitrary. The trial court abused its discretion in entering a mandatory injunction requiring appellants to remove their tennis court lights.[6]
Reversed.
NOTES
[1] Four paragraphs in the Declaration of Restrictions are relevant to this appeal:

6. NUISANCES: No noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood.
18. ARCHITECTURAL CONTROL: No building, wall, fence or other structure or improvement of any nature shall be erected, placed or altered on any lot until the construction plans and a plan showing the location of the structure have been approved in writing by the Architectural Control Committee. Each building, wall, or other structure or improvement of any nature shall be erected, placed or altered upon the premises only in accordance with the plans and plot plan so approved. Refusal of approval of plans, plot plan, or any of them, may be based on any ground, including purely aesthetic grounds, which in the sole and uncontrolled discretion of the said Architectural Control Committee shall seem sufficient. Any change in the exterior appearance of any building, wall, fence or other structure or improvement shall be deemed an alteration requiring approval. The Architectural Control Committee shall have the power to promulgate such rules and regulations as it deems necessary to carry out the provisions and intent of this paragraph. The Architectural Control Committee is composed of Marvin A. Hollub, R.A. Davenport, Sr. and James R. Stoker... .
19. TERM: These covenants are to run with the land and shall be binding on all parties and all persons claiming under them for a period of thirty (30) years from the date these covenants are recorded, after which said covenants shall be automatically extended for successive periods of ten (10) years unless an instrument signed by the then owners of a majority of the lots (excluding the publicly dedicated tracts) in the said property has been recorded, agreeing to change said covenants in whole or in part.
20. ENFORCEMENT: Enforcement shall be by proceeding at law or in equity against any person or persons violating or attempting to violate any covenant either to restrain violation or to recover damages.
[2] Tennis court lights are not specifically identified as a prohibited improvement.
[3] Two members of the three-member committee are builders who have constructed most of the homes in the subdivision. None of them live there.
[4] A foot candle is the illumination given off by a standard candle on a one square foot surface.
[5] Although by terms of the covenant the Architectural Control Committee is empowered, in its "sole and uncontrolled discretion," to refuse approval of a planned improvement on any ground (see note 1), that language does not affect the validity of the agreement. A requirement for commercial reasonableness will be read into any contract where possible, language to the contrary notwithstanding. See Fernandez v. Vazquez, 397 So.2d 1171 (Fla. 3d DCA 1981) (where lessee is entitled to sublet, but has agreed to limit that right by first acquiring the consent of the landlord, consent cannot be unreasonably withheld).
[6] Appellants represented at oral argument, and it was not disputed, that the eight 20-foot high lamps have been replaced with four 16-foot high lamps which comply with the zoning variance. We approve only that lighting which was originally authorized by the County Commission.