572 So.2d 963 (1990)
EUROPCO MANAGEMENT COMPANY OF AMERICA, Appellant,
v.
Stephen W. SMITH and Ruth R. Smith, Appellees.
No. 90-1392.
District Court of Appeal of Florida, First District.
December 17, 1990.
*964 D. Michael Chesser, of Chesser, Wingard, Barr, Whitney, Flowers and Fleet, Shalimar, for appellant.
C. LeDon Anchors, of Anchors, Foster and McInnis, Fort Walton Beach, for appellees.
ZEHMER, Judge.
Europco Management Company of America appeals a final order, entered at the end of the plaintiff's case in a nonjury trial, dismissing its action for a mandatory injunction to enforce certain protective covenants of the Southwind II housing development against homeowners Stephen and Ruth Smith. We reverse, holding that the evidence presented by Europco was sufficient to establish a prima facie case.
Europco is the owner and developer of Southwind II, a 200-acre golf course subdivision containing single-family, high-priced homes.[1] Protective covenants, which have been recorded in the official records of Okaloosa County and run with the title to the land in Southwind II, contain various restrictions on the use of the land in the subdivision and the construction and alteration of the structures built thereon. The covenants principally involved in this case recite that:
(4) MINIMUM SQUARE FOOTAGE FOR ANY PRINCIPAL RESIDENCE... . (c) No lot clearing or construction of any kind, including but not limited to construction of main structure, garages, fences or ancillary structures, shall be permitted to commence or allowed to remain on any lot until the plans, design, colors and location of said improvements on the lot have been approved by Developer acting through the Bluewater Bay Architectural Review Committee or such other representative as Developer may designate from time to time.

* * * * * *
(5) OTHER STRUCTURES. Construction of structures other than the main residence and a garage shall not be permitted on any lot of the Subdivision except for the following ancillary structures which may be permitted subject to approval by Developer of location, architectural design and exterior finishes: pet house (up to 25 square feet and not more than 5 feet high), hothouse or greenhouse (up to 100 square feet and not more than 15 feet high), poolhouse, outdoor fireplace or barbecue pit (up to 9 square feet and not more than 10 feet high), and swimming pools and mechanical installation in connection therewith. Any such ancillary structures permitted *965 hereunder shall be attractively landscaped, constructed in a harmonious design with the main structure and located only in the lot area to the rear of the main residence and not visible from the street. No ancillary structure shall be built or placed on a lot until the quality, style, color and design have been approved by the Developer in the manner provided for herein.

* * * * * *
(9) DESIGN AND LOCATION OF IMPROVEMENTS AND TREE REMOVAL TO BE APPROVED BY DEVELOPER. For the purpose of further insuring the development to be a residential area of highest quality and standards, and in order that all improvements on each lot shall present an attractive and pleasing appearance from all sides of view, the Developer reserves the exclusive power and discretion to control and approve the landscaping plan and the location on the lot and design of all building, structures and other improvements to be built on each lot. Included in the power and discretion to approve such design is the right to approve the architectural design, appearance, color, finish and materials of all exterior building surfaces. A lot owner shall be required to submit such information as Developer may request in order to facilitate Developer's approval process. One set of the plans required to be submitted for approval will be retained by Developer. If the finished building or other structure does not comply with the approved plans, Developer retains the right to cause the necessary changes to be made at owner's expense, the cost of which shall be a lien upon the property involved. Any changes in plans must first be reapproved by the Developer in accordance with the procedures specified from time to time by Developer... .
(Emphasis added.)
The Smiths purchased a home in Southwind II and required, as a condition of the sale, that the builder add a screen porch to the rear of the house. The builder, however, did not obtain the developer's approval before completing the addition and consummating the sale transaction. Subsequent to the purchase transaction, Europco sought an injunction against the Smiths on the ground that they had caused an addition to their house to be built without first seeking approval as required by the protective covenants. Europco further alleged that when approval was eventually requested, it was denied because the addition violated the developer's established policy prohibiting additions constructed of a design and material different from that of the primary structure. The complaint requested an injunction requiring the Smiths to either remove the addition or make it comply with the protective covenants and the builder's policy. The Smiths' answer denied the essential allegations of the complaint and raised the affirmative defenses of estoppel and laches.[2]
At trial, Jerry Zivan, the chief executive officer of Europco, testified that he had created an advisory committee for the architectural review of projects in Southwind II, and that the committee consisted of 3 representatives of the developer, 5 representatives of the homeowners, and 2 other representatives. Zivan testified that on July 16, 1987, the architectural review committee was making a routine inspection for an application involving property in Southwind II when a member noticed Mr. Barber, a contractor, constructing an addition on the back of a house. Zivan talked to Barber, confirmed that no request for approval of the addition had been submitted, and requested that Barber immediately cease construction. Barber agreed to stop work on the addition, and submitted an application for approval of the addition to the committee that day. One week later, as part of their review of the application, the committee visited the house and found the addition had been completed. Zivan *966 instructed the committee that they were not to consider the fact that the addition was completed without committee approval; rather, they were to apply the same standards in reviewing the application that would otherwise be applied. Zivan testified that the committee rejected the application because the materials used on the exterior of the addition were not harmonious with those used on the exterior of the primary residence (horizontal cedar lap siding on the addition, brick and stucco on the original structure), and because the primary residence had 16" to 24" roof overhangs whereas the addition had none. Zivan testified that he subsequently met with Barber and John Recher, a real estate broker representing the Smiths, who then had made a contract to purchase the home. Zivan informed Barber and Recher of the committee's rejection of the application and asked that the house be made to conform to the restrictions. Barber and Recher requested permission to complete the painting of the addition so that the Smiths could close on a permanent loan, and promised to thereafter make whatever changes were necessary. After the addition was painted and the loan closed, the Smiths refused to have the conforming changes made.
Linda Morgan testified that she is the administrative assistant for the architectural review committee and is responsible for keeping records of all its transactions and business. She fills out an application form for each homeowner or builder who intends to build or make an addition and personally presents the application to the committee; all comments are recorded on the application and a copy is returned to the applicant. She stated that the applicant is invited to communicate with the committee through her or by letter, and that every applicant receives the same treatment.
Douglas Kirby, chairperson of the homeowner group on the architectural review committee, stated that the committee found the addition to the Smiths' house unacceptable due to the lack of a roof overhang and the inconsistency in building materials.
Nancy Beaukenkamp, one of the homeowner representatives on the committee, is a graduate architect from Cornell University. She cited the same reasons for rejecting the application. The court questioned Beaukenkamp about the committee's procedure of not allowing a homeowner to present an application in person. Beaukenkamp stated that the purpose of this procedure is to ensure that the members of the committee are able to be objective in making their decisions; she stated that she did not feel they could do so if their neighbors were appearing before them in person.
After Europco rested its case, the Smiths filed a motion for "directed verdict," alleging that they had been denied due process of law since they had been precluded from appearing personally before the committee. The court treated the Smiths' motion as one for involuntary dismissal pursuant to Rule 1.420(b), Florida Rules of Civil Procedure (1990),[3] and granted it. The court ruled that the Smiths had been denied due process in that they were denied an opportunity to appear in person before the architectural review committee. The court further ruled that Europco had failed to prove by a preponderance of the evidence that the addition "diminished the value of the surrounding property in the subdivision, that the [Smiths'] addition changed the consistent pattern of development of the subdivision or that the [Smiths'] addition was noticeably different as to quality or appearance than other homes in the subdivision." Last, the court ruled that Europco's attempted application of the restrictive covenants to the Smiths was arbitrary and unreasonable.
Appealing, Europco first asserts that the trial court erred in ruling that the *967 Smiths were denied due process because they were not afforded an opportunity to appear in person before the architectural review committee. No authority is cited by the trial court in support of this proposition and we know of none. The undisputed facts of this case show that Europco complied with all necessary due process requirements for enforcement of a protective covenant such as involved in this case. See Majestic View Condominium Association, Inc. v. Bolotin, 429 So.2d 438 (Fla. 4th DCA 1983) (Due process requirements for enforcement of a protective covenant are (1) constructive or actual notice of the existence of the restriction prior to enforcement; (2) a reasonable demand for compliance with the restriction after the breach has occurred; and (3) compliance with any applicable procedural due process considerations that require notice of the commencement of the litigation and an opportunity to be heard in court.) The developer is not required to provide a forum at which the applicant can personally appear and be heard. Notice and opportunity to personally appear and be heard in court is all that is necessary. The Smiths have not defended this ruling in their answer brief, and when questioned about it at oral argument conceded the issue, stating that they had "abandoned" it. We therefore reverse this ruling.
Europco next argues that the remaining rulings on which the trial court based its dismissal constitute reversible error because they not only conflict with applicable legal principles but also manifest the court's complete disregard for the evidence presented and amount to the substitution of the trial court's judgment for that of the witnesses to whom the discretion of approval was delegated. We find ourselves in agreement with these contentions.
An involuntary dismissal is only proper when the evidence considered in the light most favorable to the non-moving party fails to establish a prima facie case in favor of that party. Alpha Electric Supply, Inc. v. Jewel Builders, Inc., 349 So.2d 699 (Fla. 4th DCA 1977). Where, as here, one party seeks an injunction to prevent the violation of a restrictive covenant, a prima facie case is established by evidence showing the alleged violation. See Stephl v. Moore, 94 Fla. 313, 114 So. 455 (Fla. 1927). In this case, the testimony of Zivan, Kirby, and Beaukenkamp was sufficient to establish that the addition to the Smiths' house was constructed in clear violation of the covenants quoted above.[4] Reading all *968 the covenants in pari materia demonstrates rather clearly the intent that the developer reserve control over the architectural design and aesthetics of the structures and landscapes in the project, and that such control, although amounting to plenary discretion in such matters, is to be fairly exercised in a reasonable manner by the developer directly or through delegation to a committee. The covenants make specific provisions for enforcement of the restrictions by resort to liens and court proceedings, but do not predicate enforcement solely on a showing of diminished value to the surrounding property.[5] They simply vest in the developer or a delegated committee reasonable authority and discretion to control exterior architectural design and construction so as to maintain the consistency and compatibility of the design and appearance with the entire project pursuant to reasonable policies and standards uniformly and fairly, not arbitrarily, applied. There is no requirement that such policies and standards be in writing, as contended by the Smiths.
All three witnesses established without contradiction (1) that the addition was built without the approval of the architectural review committee, and (2) that the application was rejected because the materials used on the exterior of the addition were not harmonious with the materials used on the exterior of the primary residence and the design of the addition's roof overhangs was not compatible with the design of the existing structure. This record demonstrates nothing arbitrary or unreasonable about either the requirement for prior approval of home additions or the policy requiring use of consistent materials and roof lines for additions to existing structures. There is no evidence that these requirements were unfairly and inconsistently applied. The evidence thus established a prima facie case that the builder's construction of the porch addition without approval violated the clear intent of the protective covenants, and it was reversible error for the trial court to rule otherwise.
We also find error in the trial court's ruling on the defendants burden of proof.[6] The principle is well established that to enforce a restrictive covenant, one need not show that the violation thereof amounts to an irreparable injury or constitutes a nuisance to the complainant. Daniel v. May, 143 So.2d 536 (Fla. 2d DCA *969 1962). The right to enforce such a covenant does not depend upon whether the covenantee will be damaged by the breach; the breach itself is sufficient ground for interference by injunction. 7 Fla.Jur. 2d Building, Zoning, and Land Controls § 48 (1978) (emphasis added). The burden is on the party challenging enforcement of the restrictions to show in what manner the developer has illegally exceeded or abused reserved authority and discretion to approve architectural changes. Whether the Smiths' addition diminished the value of surrounding property is not controlling, absent a showing that the developer or the committee unlawfully exercised its approval authority. Whether the Smiths' addition changed the consistent pattern of development of the subdivision or was noticeably different as to quality or appearance than other homes in the subdivision so as to be unacceptable is a matter of discretion for the developer or the committee in the first instance. The Smiths, as the challenging party, rather than the developer, bear the burden of showing by competent substantial evidence that this discretion has been arbitrarily and unreasonably exercised in this instance. The trial court's function is to review that exercise of discretion based on the opinion evidence adduced, not upon a personal opinion formed after review of photographs of the development (as argued by the Smiths) and application of personal views concerning architectural standards and concepts of aesthetics.
Finally, the trial court erred in ruling that, "The attempted application of the restrictive covenants by [Europco] was arbitrary and unreasonable as to [the Smiths]." Unquestionably the Smiths can defend against the requested injunction by showing that the covenants they allegedly violated are unreasonable or arbitrary on their face, or are being exercised and applied in an unreasonable or arbitrary manner. Coral Gables Investments, Inc. v. The Graham Companies, 528 So.2d 989 (Fla. 3d DCA 1988); Kies v. Hollub, 450 So.2d 251 (Fla. 3d DCA), rev. denied, 453 So.2d 1364 (Fla. 1984). But this contention is an affirmative defense with the burden resting upon the party attacking the reasonableness of the application of the covenants. Here, the Smiths' answer did not raise this issue; it was first mentioned in their motion for involuntary dismissal at the close of Europco's case. The evidence before the court, considered in the light most favorable to Europco, did not demonstrate that the covenants were facially unreasonable or arbitrary, or that the developer's discretion thereunder was being exercised and applied in an unreasonable or arbitrary manner. On the contrary, Europco's evidence established that the committee's decision to reject the Smiths' application was consistent with the developer's policy governing approval of such additions and the committee's prior decisions on other homeowner applications for additions.[7] The trial court erred in rejecting that evidence and making a contrary finding in its order of dismissal.
The appealed order is REVERSED and this cause is REMANDED for further proceedings in accordance herewith.
SMITH and NIMMONS, JJ., concur.
NOTES
[1] Southwind II is part of Bluewater Bay Resort Community in Okaloosa County.
[2] The Smiths also filed a third-party complaint against the builder, Barber Construction Company, Inc., wherein they alleged that Barber added the porch and sold them the home without obtaining the developer's permission and thus should indemnify the Smiths if they are required to make the addition conform.
[3] Fla.R.Civ.P. 1.420(b) states, in pertinent part, After a party seeking affirmative relief in an action tried by the court without a jury has completed the presentation of his evidence, any other party may move for a dismissal on the ground that on the facts and the law the party seeking affirmative relief has shown no right to relief, without waiving the right to offer evidence if the motion is not granted. The court as trier of the facts may then determine them and render judgment against the party seeking affirmative relief or may decline to render judgment until the close of all the evidence.
[4] See pages 964-965, supra. Other pertinent provisions in the Southwind II restrictive covenants read as follows:

(11) FUTURE PURCHASERS. The original purchaser of property in this Subdivision as well as subsequent purchasers are bound by these covenants and restrictions which run with the land (see Article 37). Therefore, structural modifications to existing structures, new structures (such as ancillary structures and fences) and exterior color changes of any structure must be approved in advance by the Developer or his authorized representative.
* * * * * *
(31) DEVELOPER MAY CORRECT VIOLATIONS. Wherever there shall have been built or there shall exist on any lot any structure, building, thing or condition which is in violation of these covenants and restrictions, the Developer shall, after giving written notice to the lot owner, have the right, but not the obligation, to enter upon the lot or street frontage where such violation exists and summarily abate, correct or remove the same, all at the expense of the lot owner payable to the Developer on demand. Such entry and abatement, correction or removal shall not be deemed a trespass nor make the Developer liable in any way for any damages on account thereof. In the event of a failure of such owner to pay the Developer any sums required to be paid Developer under these covenants and restrictions, the Developer shall have the right to file a notice of lien as provided in Section 41 hereof.
(32) APPROVAL OF DEVELOPER. Wherever in these covenants and restrictions the consent or approval of the Developer is required to be obtained, no action requiring such consent or approval shall be commenced or undertaken until after a request for approval is submitted in writing to the Developer and approved by the Developer. Such request shall be hand delivered or sent to the Developer by Certified Mail, Return Receipt Requested. After the Developer acts upon the application, it must be picked up and signed for by the applicant. No action shall be taken by or on behalf of the person or persons submitting such application which action violates any of the covenants and restrictions herein contained.
* * * * * *
(38) RULES OF CONSTRUCTION. All parties who take title subject to these Covenants and Restrictions understand the general rule of law to be that such covenants are to be construed strictly, against the Declarant and in favor of unrestricted use. All parties agree that these Covenants and Restrictions shall instead be construed to accomplish their purpose consistent with continued support of the value of lots. These Covenants are to be construed reasonably to accomplish their purpose.
(39) LEGAL ACTION ON VIOLATIONS. If any person, firm or corporation, or other entity shall violate or attempt to violate any of these covenants and restrictions it shall be lawful for the Developer or any person or persons owning any lot of the Subdivision (a) to prosecute proceedings at law for the recovery of damages against those so violating or attempting to violate any such covenants and restrictions and (b) to maintain a proceeding in equity against those so violating or attempting to violate any such covenants and restrictions, for the purpose of preventing or enjoining all or any such violations or attempted violations. The remedies contained in this paragraph shall be construed as cumulative of all other remedies now or hereafter provided by law... .
[5] The recitation in paragraph 38 of the covenants ("All parties agree that these Covenants and Restrictions shall instead be construed to accomplish their purpose consistent with continued support of the value of lots") means only that the general restrictions on aesthetic changes are intended to preserve value, not that enforcement of the restrictions is limited to instances of diminished value to surrounding lots, as is made clear in the next sentence of that paragraph ("These Covenants are to be construed reasonably to accomplish their purpose").
[6] We quote from the order:

[Europco] failed to prove by a preponderance of the evidence that the addition to the home of the [Smiths] diminished the value of surrounding property in the subdivision, that the [Smiths'] addition changed the consistent pattern of development of the subdivision or that [the Smiths'] addition was noticeably different as to quality or appearance than other homes in the subdivision.
[7] Nancy Beaukenkamp testified that the committee's decision to reject the application was consistent with the decisions that had previously been made regarding additions, and that such consistency could be confirmed by observing the homes in Southwind II and Bluewater Bay.