765 So.2d 874 (2000)
The WOODLANDS CIVIC ASSOCIATION, INC., etc., et al., Appellants,
v.
DAVID W. DARROW, D.C., P.A., etc., et al., Appellees.
No. 5D99-1360.
District Court of Appeal of Florida, Fifth District.
August 18, 2000.
John A. Baldwin of Baldwin & Morrison, P.A., Fern Park, for Appellants.
Tucker H. Byrd and Elliot H. Scherker of Greenberg, Traurig, P.A., Orlando & Miami respectively, for Appellees.
ORFINGER, M., Senior Judge.
The Woodlands Civic Association (Woodlands), a voluntary homeowners association, and three individual property owners appeal a final judgment denying the enforcement *875 of a deed restriction limiting the use of lots within the Woodlands subdivision to residential purposes. We affirm.
The deed restrictions, in pertinent part, are as follows:
1. No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one detached single family dwelling not to exceed two stories in height and a private garage for not more than two cars.
2. No building shall be erected, placed or altered on any lot until the construction plans and specifications and a plan allowing the location of the structure have been approved by the Architectural Control Committee as to quality of workmanship and materials, harmony of external design with existing structures and as to location with respect to topography and finish grade elevation.

* * *
Dr. David Darrow purchased the property in question in mid 1996 from Margaret Wilde intending to use the property as a chiropractic office. At the time of the purchase he was not aware of any deed restrictions on the property nor did his title examination disclose any restrictions.[1] Margaret Wilde was a registered real estate broker and had conducted her real estate business on the property from some time in 1989. In early 1993 she decided to sell the property and had a large sign placed thereon which advertised the property for sale as a commercial location. She did extensive renovations to the interior of the building which included tearing out walls and leveling floors to provide access for handicapped persons. On the exterior of the building she constructed designated parking spaces which included two handicapped parking places with the necessary signs restricting those spaces to handicapped persons. At the driveway was a sign reading "Entrance" with an arrow pointing left, a sign over the garage reading "Do Not Park HereFirelane", a handicapped ramp leading up to the front door and a "Stop" sign at the exit. During the entire period of construction, which ran from July 1993 until May, 1994, a large dumpster sat in the front yard, completely visible. Concrete trucks came and went. Clearly, the work was open and obvious. Ms. Wilde testified she was unaware of any deed restrictions. Although required to do so by the restrictive covenants, no plans for the renovations were submitted to the Woodlands' Architectural Control Committee, no approval of said plans by the committee were requested prior to completion of the renovations, nor was there any complaint by Woodlands.
The evidence at trial, which the trial court had a right to rely on, indicated that while the renovations were under way, Ms. Wilde was contacted by Ms. Morris, the then president of the Woodlands, who asked what she was doing. Ms. Wilde advised Ms. Morris that she was converting the building into a commercial property with the intention of selling it as a commercial property.[2] Although aware of the restrictions, nothing was done by Ms. Morris or Woodlands to deter the conversion. Mr. Hauser, a named plaintiff herein who lives across the street from Ms. *876 Wilde's property, testified that he observed the renovations being made, and although he was intimately familiar with the covenants and restrictions, he did nothing to seek their enforcement.[3] For approximately three years thereafter the property was advertised for sale with signs on the property indicating that it was a commercial parcel. No action was taken by Woodlands or anyone else.
Dr. Darrow testified that before he signed a contract to purchase the property he reviewed documents provided by Ms. Wilde indicating that proper permitting, concurrency and zoning approval had been obtained from Seminole County. Before closing on the property, he spoke with Mr. Laird, who was then the president of Woodlands and advised Mr. Laird of his plans to open a chiropractic clinic on the property. Mr. Laird advised Dr. Darrow that the property owners in the subdivision probably would not like it, but that there was nothing they could legally do to stop it. Mr. Laird confirmed this conversation. Gary Medley, retained by Dr. Darrow as a buyer's broker before entering into the transaction, also testified that he had spoken to Mr. Laird and that Mr. Laird had also told him that while the property owners would probably not be happy with the proposed use, "... he knew that legally there wasn't anything he could do about it." Mr. Medley also checked county records and determined that the zoning was proper and that impact fees had been paid and concurrency requirements had been met. He was not aware of any restrictions on this property, but did not think this was unusual because the property was unplatted,[4] fronted on the highway, and it was common for developers to leave highway frontage available for commercial use.
Dr. Darrow closed on the purchase in May, 1996 and began to operate his clinic in July. During the two months between the closing and the commencement of his operation, Dr. Darrow made additional extensive and expensive improvements to the interior of the building, all without complaint from the Woodlands, although, through its president, it was well aware of the intended use of the property. Again, there was no submission to the Architectural Control Committee, nor was Dr. Darrow notified that this was required.
The trial court made no findings in its final order denying enforcement of the restrictions and although, as we shall discuss later, the trial court first attempted to fashion a solution which it hoped would make all parties happy, we must affirm the trial court's conclusion if it is correct for any reason. See Home Depot U.S.A. Co. v. Taylor, 676 So.2d 479, 480 (Fla. 5th DCA 1996). The instant facts present a classic case of waiver so as to estop the Woodlands from enforcing its deed restrictions against Dr. Darrow.
The right to enforce a restrictive covenant may be lost by waiver or acquiescence. This is so, for instance, where, by failing to act, one leads another to believe that he or she is not going to insist on the covenant, and such other person is damaged thereby.... It is contrary to equity and good conscience to enforce rights under restrictive building covenants where the defendant has been led to suppose by word, conduct or silence of the plaintiff that there were no objections to his or her operations.
20 Am.Jur.2d, Covenants, § 239 (1995).
In Taylor v. Kenco Chemical & Mfg. Corp., 465 So.2d 581, 587 (Fla. 1st DCA *877 1985), the court laid out the elements of waiver as follows:
Waiver is the intentional or voluntary relinquishment of a known right, or conduct which infers the relinquishment of a known right.... The essential elements of waiver are (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right.... Waiver may be express, or implied from conduct or acts that lead a party to believe a right has been waived.... However, when waiver is to be implied from conduct, "the acts, conduct, or circumstances relied upon to show waiver must make out a clear case."
(Citations omitted).
Thus, in Wischmeyer v. Finch, 231 Ind. 282, 107 N.E.2d 661 (1952), the Indiana supreme court refused to enjoin the operator of a trailer park in lots restricted to residential use where the use had continued for several years and the owners had made improvements during that period. Similarly, in Twin States Realty Co. v. Kilpatrick, 199 Miss. 545, 26 So.2d 356 (1946), the Mississippi supreme court rejected a request to enjoin the operation of a tea room and gift shop where such use had continued for six years and the defendant, who first leased the property and later purchased it, had made an investment in the purchase and in improvements to the property, stating that considerably less time than six years had been deemed sufficient as a bar in other cases. The Mississippi court explained why it would be inequitable to enforce restrictions under those circumstances, thusly:
There is no hard and fast rule as to what constitutes laches. If there has been unreasonable delay in asserting claims or if, knowing his rights, a party does not seasonably avail himself of means at hand for their enforcement, but suffers his adversary to incur expense or enter into obligations or otherwise change his position, or in any way by inaction lulls suspicion of his demands to the harm of the other, or if there has been actual or passive acquiescence in the performance of the act complained of, then equity will ordinarily refuse her aid for the establishment of an admitted right, especially if an injunction is asked. It would be contrary to equity and good conscience to enforce such rights when a defendant has been led to suppose by the word [or silence, or conduct] of the plaintiff that there was no objection to his operations. Diligence is an essential prerequisite to equitable relief of this nature. Quiescence will be a bar when good faith requires vigilance.
26 So.2d at 368. The trial court correctly concluded that it would be inequitable to enforce the restrictions under the facts presented here.
Woodlands next argues that the final judgment as entered must be reversed because it is contrary to the trial court's oral pronouncements. The trial court made no pronouncements at the conclusion of the testimony but, according to the Statement of Proceedings approved by the court and provided to us in a supplemental record, the court did orally communicate to counsel how it proposed to rule and directed Dr. Darrow's counsel to prepare a proposed final judgment. This was done, and, although unsigned and never entered, the proposed final judgment is before us in the supplemental record. Assuming as we must that the proposed final judgment correctly reflects the gist of the trial court's telephone communication to counsel, we note that after reciting the nature of the case, the proposed judgment states: "The court finds that enforcing the restrictive covenants against Defendants ... so as to prohibit the use of Defendants' premises... for business purposes would be inequitable under the circumstances." The final judgment appealed from does not conflict with this finding. The proposed final judgment then attempts to fashion a remedy in an attempt to satisfy the demands of *878 all parties. The court, however, reserved the right to approve and implement a plan if the parties could not agree on the plan the court was proposing. Apparently no such agreement was reached, and the court entered the instant final judgment refusing to enforce the covenants against Dr. Darrow exactly as had been orally pronounced. We see no conflict.
AFFIRMED.
PETERSON, J., concurs.
THOMPSON, C.J., dissents without opinion.
NOTES
[1] The property in question is shown on the plat of "The Meadows, Unit 1", but marked "Not Included." The Meadows subdivision runs northerly from S.R. 434 in Seminole County. Immediately to the north of The Meadows is the Woodland Subdivision. The deed restrictions in question apply to all lots in the Woodlands Subdivision, and they include, by metes and bounds descriptions, three parcels in the Meadows plat, one of which is the property in dispute here which fronts directly on S.R. 434. This may explain why a title search of the subject property failed to disclose the restrictions.
[2] The property, for many years prior thereto had been zoned CN by the county, a commercial zoning which permitted offices, and Ms. Wilde had secured the necessary county approvals.
[3] Although denied by Mr. Hauser, Ms. Wilde's husband testified that about the time the renovations were completed he spoke with Mr. Hauser and that he took Mr. Hauser into the property and pointed out all the interior and exterior changes and modifications which had been made. Disputed issues of fact must be reviewed in the light most favorable to the prevailing party.
[4] As previously indicated, while shown on the plat of The Meadows, this parcel was part of a larger parcel marked "Not Included."