819 So.2d 190 (2002)
EMERALD ESTATES COMMUNITY ASSOCIATION, INC., a Florida not-for-profit corporation, Appellant,
v.
Barry GORODETZER and Kathy Gorodetzer, his wife, Appellees.
Nos. 4D01-2258, 4D01-3484.
District Court of Appeal of Florida, Fourth District.
May 15, 2002.
Rehearing Denied June 18, 2002.
*191 Nancy W. Gregoire of Bunnell, Woulfe, Kirschbaum, Keller, McIntyre & Gregoire, P.A., Fort Lauderdale, for appellant.
Michael Schiffrin & Associates, P.A., and James C. Blecke of Deutsch & Blumberg, P.A., Miami, for appellees.
POLEN, C.J.
Emerald Estates Community Association, Inc. timely appeals the trial court's entry of final judgment in favor of Plaintiff/Appellees Barry and Kathy Gorodetzer on the Gorodetzer's declaratory action. We reverse and remand for further proceedings consistent with this opinion.
The Gorodetzers purchased their home in Emerald Estates directly from the developer in September of 1995. The Gorodetzers proceeded to erect four ham radio antennas in their backyard sometime before June 1996. The antennae ranged in height from thirteen to twenty-three feet; the tallest antenna extended approximately two and one-half feet above the roofline of their house.
The community of Emerald Estates was governed by a Declaration of Restrictions and Covenants. The Declaration was in effect at the time the Gorodetzers purchased their home; the homeowners' Association was controlled by the developer at that time. The Declaration provided for the creation of an Architectural Control Committee ("ACC"), a permanent committee of the homeowners' Association, whose function was to administer and perform the architectural and landscape review and control functions relating to the community. Per the Declaration, as Restated in 1998, homeowners were required to obtain approval of the ACC prior to erecting any antenna: "Unless otherwise permitted by law, no antenna ... of any type shall be placed upon a home or with a lot unless approved by the [ACC]."[1] Community Standards subsequently adopted by the Association further defined the functions of the ACC. The pertinent provision regarding the installation of antennae provided, "All outside antennas, antenna poles, antenna masts, electronic devices, satellite dish antenna, or antenna towers are subject to prior approval of the [ACC]. The [ACC] may require that all such items be screened from view and that the installation of the antenna comply with all applicable safety restrictions."
The Declaration evinced an intent to create a general plan and scheme of development of high quality within Emerald Estates; as such, the ACC was empowered to approve or disapprove all architectural, landscaping and location of any proposed improvements within the community, in order to maintain harmony of exterior design and conformity among surrounding structures and topography. *192 Furthermore, the ACC's approval process was outlined as follows: "No material improvements... which [are] visible from the exterior of a Home shall be constructed, erected, removed, planted, or maintained... until the plans and specification showing the nature, kind, shape, height, materials, floor plans, color scheme and the location of the same shall have been submitted to and approved in writing by the ACC." (Emphasis added.)
April 21, 1998, control of the homeowners' Association was turned over from the developer to the homeowners. Shortly thereafter, the homeowner-controlled Association sent the Gorodetzers a letter notifying them that their antennae were interfering with T.V. reception in the community, and more importantly, had been installed without architectural approval. The letter requested the immediate removal of the antennae. This initial request was not responded to, which caused the Association to send the Gorodetzers two follow-up letters. The third letter threatened a daily fine of $25 if the antennae were not removed within a weeks time. The antennae were removed. The Gorodetzers notified the Association of their desire to "appeal" the Board's decision. The Board responded with an invitation for the Gorodetzers to file a formal application regarding their plans to (re)install their radio antennae. The Board's letter requested the Gorodetzers supply certain details such as the placement, location, size, and permanence of the proposed antennas. The Gorodetzers filed an application; the Board responded by sending a temporary denial letter, which posited a few additional questions regarding the antennae (e.g., could they be taken down when not in use? what "bands" did they transmit on?), and requested Mr. Gorodetzer's presence at the Board's June 17, 2001 meeting. Mr. Gorodetzer, accompanied by his attorney, attended the Board meeting. Mr. Gorodetzer was told he would be informed of the Board's decision in the near future. A few weeks later he received a letter from the Board denying his application. The Gorodetzers subsequently filed a declaratory action in circuit court, accusing the Association of unreasonably rejecting their application to reerect their four antennas, and requesting the court to enter judgment declaring their right to erect ham radio antennas on their property.
The case proceeded to a bench trial held April 19, 2000. Mr. Gorodetzer readily admitted he had never filed a formal written application prior to originally erecting the antennae in September of 1995. However, he stated he had asked the developer's salesperson if erecting ham radio antennas would be okay to which the salesperson responded it would "not be a problem." Representatives of the Board reiterated that Mr. Gorodetzer had never filed a proper application any time prior to the Board's 1999 invitation to do such. The Association also introduced the expert testimony of electric engineer Roger Boyell. Boyell had been retained by the Association in the course of litigation in February 2001. His tasks were to provide an opinion regarding possible interference concerns and to propose aesthetic alternatives to the permanent vertical antennae proposed which the Gorodetzers sought to erect. Boyell drafted a proposal which was introduced at trial as joint exhibit # 39. Boyell's proposal called for one or two thin suspended wire antenna which would extend from the roof of the house to the Gorodetzer's back fence. Because these wires were thin, they would require no mounting structure and would be "imperceptible." Both Mr. Gorodetzer and representatives of the Board testified Boyell's proposal was an acceptable compromise.
*193 The lower court entered final judgment in favor of the Gorodetzers on two independent theories: (1) that the Association did not act reasonably in rejecting the Gorodetzers' 1999 application, and (2) that the originally erected antennas were "grandfathered" when control of the Association was turned over to the homeowners. As such, the Gorodetzers were entitled to erect either the "grandfathered" vertical antennas or the suspension antennae recommended by Boyell. We find the lower court's reasoning and decision erroneous in a number of regards, and accordingly reverse.
Reviewing the final judgment entered below, we find error in the lower court's construction of the controlling documents, i.e., the Declaration and the Community Standards. In paragraph (C) of the final judgment the lower court held,
[T]he Declaration and the Standards do not proscribe the ability and right of a home owner such as Plaintiffs to have antennas, instead they permit the use of antennas as long as approval is obtained from the [ACC]. The Standards go on to state that the consideration and approval of the antennas be governed by certain objective criteria, i.e., the installation comply with safety restrictions as to location and height, as well as be in compliance with local codes.
We respectfully disagree. We note the controlling section of the Declaration expressly states, "[N]o antenna ... of any type shall be placed upon a home or within a lot unless approved by the [ACC]." We fail to see how this clear language represents anything but an express prohibition against the erection of any antennae without prior approval of the ACC. See, e.g., Heck v. Parkview Place Homeowners Ass'n, Inc., 642 So.2d 1201 (Fla. 4th DCA 1994). Restrictions found within a Declaration are afforded a strong presumption of validity, and a reasonable unambiguous restriction will be enforced according to the intent of the parties as expressed by the clear and ordinary meaning of its terms, and only where intent cannot be ascertained will the covenant not be enforced. See Eastpointe Property Owners' Ass'n, Inc. v. Cohen, 505 So.2d 518, 519 (Fla. 4th DCA 1987)(noting each owner purchases knowing of and accepting the restrictions found within the Declaration).
Furthermore, we find the discretion and power of the ACC is in no way circumscribed to the exclusive consideration of objective criteria. Our review of the pertinent covenants in pari materi imparts a clear intent on behalf of the Association that they, through the ACC, reserve control over the architectural design and aesthetics of the community. See generally Europco Management Co. of America v. Smith, 572 So.2d 963 (Fla. 1st DCA 1990). Where an Association has reserved plenary discretion to evaluate applications on aesthetic grounds, as has the ACC here, such discretion still must be exercised "reasonably." Id. A party challenging the enforcement of an otherwise valid restrictive covenant, has the burden to prove defensive matters that preclude enforcement, such as the enforcing authority acted in an unreasonable or arbitrary manner. See Killearn Acres Homeowners Ass'n v. Keever, 595 So.2d 1019, 1021 (Fla. 1st DCA 1992). Upon review of the record, we hold this burden was not met.
Boyell's testimony, and his antennae proposal, played a central role at the trial below. As noted by the trial judge, "Interestingly both Plaintiffs and Defendant testified that they were agreeable to the solution proposed by Mr. Boyell." Noting the lack of dissension surrounding Boyell's proposal, the court expressly adopted said proposal as part of its final judgment. In holding such, the trial court *194 held the Associations' denial of the Gorodetzers' application was "unreasonable," where a "readily available solution" had been available, namely Boyell's proposal. Yet, Boyell's proposal was not received until February of 2001; clearly, it had not been before the Board in June/July of 1999 when the decision to deny the Gorodetzers' application to install vertical antennae was made. We find the Board's failure to consider a non-existent solution does not constitute unreasonable behavior. As discussed, supra, the Gorodetzers' had the burden of establishing the Board acted in an unreasonable or arbitrary manner. Yet the Gorodetzers did next to nothing to advance their cause. In effect, they approached the Board with a "take it or leave it" proposal. Mr. Gorodetzer stated he was unaware of any alternatives to his vertical antennae and summarily dismissed the Board's aesthetic concerns, which he claimed he did not understand.[2] Additionally, representatives for the Board testified the Board had been concerned regarding possible interference that could be caused by the Gorodetzers' antennas, to which Mr. Gorodetzer's cursory assurances failed to provide sufficient "comfort." Simply, the Board expressed concerns regarding aesthetics and matters of interference in relation to the Gorodetzers' application which the Gorodetzers failed to adequately address at the pertinent time, i.e., when the application was pending.
We also find inadequate record support for the lower court's finding that the original antennas had been "grandfathered" by April of 1998, in effect acting as an estoppel preventing the homeownercontrolled Association from enforcing the restrictive covenant against antennas. First and foremost, the Declaration contains an express anti-waiver provision, consideration of which is noticeably absent from the rather detailed eight page final judgment. This provision provides (1) homeowners shall not be required to alter previously approved and constructed improvements, and (2) failure by the Association to enforce any restriction shall in no event be deemed a waiver of the right to do so thereafter. This provision, found within the Declaration, is afforded a strong presumption of validity. See Eastpointe Property Owners', 505 So.2d at 519.
When control of the Association had been turned over to the homeowners in April of 1998, the Gorodetzers' antennas had not been previously approved; the Gorodetzers had never even filed a formal application, a necessary prerequisite for approval as laid out in the Declaration. Mr. Gorodetzer admitted reading the pertinent "documents" before purchasing the home in Emerald Estates. His mere act of asking a salesperson whether antennas would be okay, and receiving a verbal response that it would "not be a problem," clearly falls short of the formal written approval process outlined in the Declaration. The fact the Association was controlled by the developer at that time provides the Gorodetzers no shelter from the formal written application procedures outline in the Declaration. The Gorodetzers *195 needed to file a written application, and receive written approval, by the Association in whatever form it existed, i.e., the developer or its agents, in order to establish "previous approval" acting as an estoppel on the Association. See Fountains of Palm Beach Condominium, Inc. No. 5 v. Farkas, 355 So.2d 163 (Fla. 4th DCA 1978)(finding where unit owner approached management firm and was told they had no objection but never obtained formal permission of Association, owner was not justified in believing she could safely ignore the Declaration's requirement of prior written consent); Esplanade Patio Homes Homeowners' Ass'n, Inc. v. Rolle, 613 So.2d 531 (Fla. 3d DCA 1993). Furthermore we find there was no longcontinued waiver or acquiescence by the Association in relation to the Gorodetzers' violation of the restrictive covenant where the Association notified the Gorodetzers of their violation, and requested removal of the antennas, immediately upon the homeowners' ascension to power. See Estates of Fort Lauderdale Property Owners' Ass'n, Inc. v. Kalet, 492 So.2d 1340 (Fla. 4th DCA 1986); cf. Woodlands Civic Ass'n, Inc. v. David W. Darrow, D.C., P.A., 765 So.2d 874 (Fla. 5th DCA 2000).
Consistent with the foregoing analysis we reverse the final judgment entered by the lower court. Like the lower court we too appreciate the lack of dissension regarding Boyell's suspension-wire proposal. However, we formulate a different resolution. We direct the Board to consider Boyell's proposal in accord with the guidelines outlined in the governing Declaration and Community Standards. Boyell's proposal is to be treated as a properly-filed formal application, filed on the Gorodetzers' behalf. If the Board, acting upon the ACC's formal recommendation, approves of Boyell's proposal, the matter shall be resolved and no further intervention by the judiciary shall be needed. On the other hand, if the Board denies said proposal, the lower court shall determine whether said denial was unreasonable or arbitrary. In that instance, and that instance only, the lower court may determine, and award, appropriate prevailing party attorneys' fees as provided in the Declaration. Pursuant to this opinion, reversing the judgment entered below, the attorneys' fees awarded the Gorodetzers as the prevailing party below are also reversed. The Association's motion for appellate attorneys' fees is hereby granted, and on remand, the trial court shall determine a reasonable fee amount.
REVERSED and REMANDED for further proceedings consistent with this opinion.
STONE and GROSS, JJ., concur.
NOTES
[1] The original Declaration, in effect when the Gorodetzers purchased their home, contained a similar, perhaps even more restrictive, provision regarding antennae: "No antenna, aerial or satellite dish of any type shall be placed upon a Unit, Condominium Unit or within a Lot or the common elements of a condominium unless approved by the Board or Committee."
[2] The final judgment sympathetically notes the Gorodetzers "even went so far as to propose objective standards" to the Board in conjunction with their application to erect the vertical antennas. We note Mr. Gorodetzer's self-serving "objective standards" would have allowed antennae a full fifteen feet taller than his antennas to which the Board had voiced aesthetic concerns. Such "objective criteria" do not appear to take the Board's aesthetic concerns seriously, especially where the uncontroverted evidence established there were no other vertical antennae in the community, and the representative of the Board testified they had been concerned the Gorodetzers' vertical antennas would create a dangerous aesthetics precedent in the community.